**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **YOLANDA CLEVELAND,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 14 C 7579** |
| **v.** | ) | |
| | ) | **Magistrate Judge Finnegan** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Yolanda Mashell Cleveland's claim for Disability Insurance Benefits. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). After careful review of the record, the Court affirms the decision and denies Plaintiff's request to remand.

## PROCEDURAL HISTORY

Plaintiff filed claims for Disability Insurance Benefits ("DIB") on March 22, 2011 and July 21, 2011, alleging in both applications that she has been disabled since October 15, 2000 due to ulcerative colitis, Baker's cysts in her knees, back pain and leg spasms, and depression and a personality disorder due to post traumatic stress. (R. 187, 189, 220). The claim was denied initially and upon reconsideration, after which she requested a hearing. On November 14, 2012, a hearing was held before Administrative Law Judge Carla Suffi (the "ALJ"). Plaintiff personally appeared and testified at the hearing and was represented by counsel. A vocational expert and

Plaintiff's mother also testified. On January 4, 2013, the ALJ denied Plaintiff's claim for DIB, finding her capable of performing a significant number of sedentary jobs available in the national economy. The Appeals Council then denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by this Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

Plaintiff seeks remand based on four alleged errors: (1) a flawed credibility assessment; (2) erroneous mental and physical residual functional capacity ("RFC") determinations; (3) incomplete hypothetical questions to the vocational expert; and (4) an insufficient evaluation of the finding by the Department of Veterans' Affairs that she is "unemployable."

## FACTUAL BACKGROUND

Plaintiff was born on August 14, 1968 and was 44 years old at the time of the ALJ hearing. A peacetime veteran of the United States Navy (from 1986-1987), she has a high school diploma and some college education. At the time of her hearing, she lived at home with her mother and two daughters, ages 13 and 19.

**A.  Work History**

The Court is not ordinarily tasked with determining when a plaintiff stopped working, but because varying accounts of Plaintiff's work history impact both the ALJ's credibility determination and the VA's assessment that she is unemployable, the conflicting accounts are summarized here. In a Work History Report completed on August 11, 2011 for her DIB application, Plaintiff described her extensive work history, including positions as a Navy Airman from 1986-1987; a hospital billing clerk from 1989-

1990; a clinic clerk at the University of Illinois Hospital from 1990-1992; an interviewer for a data entry company from 1996-1997; and a Staff Lead at Household Finance from 1997-2000. (R. 276-84). Plaintiff stated that she was terminated from the Staff Lead job on October 15, 2000, the Alleged Onset Date of her disability ("AOD"), because she was taking too much time off for medical appointments and treatments. (R. 187, 220-21).

There is conflicting evidence on record about Plaintiff's work history since her AOD. According to her hearing testimony, she purchased a cleaning franchise in 2000 and worked for the business for only a few months. (R. 47-48). The checks continued to arrive in her name, but all of the cleaning work for the business was done by her boyfriend; the sales, customer service, payroll and other administrative tasks have been handled by the franchisor. (R. 47, 49-50). However, in a "Work Activity Report (Self-Employed Person)" completed by phone on July 25, 2011, Plaintiff indicated that she purchased the franchise in 2003 and both she and employees performed cleaning activities, although she gradually reduced her own cleaning due to illnesses until 2005, when she stopped working altogether. (R. 247-49). She stated that she only has one remaining employee and one remaining client, a church. (R. 48, 248). An SSA reviewer determined that Plaintiff's work from 2003 through May 2005 earned her significant gainful income as defined in SSA regulations and recommended a disability onset date of May 31, 2005. (R. 251). Her attorney, at one point, accepted this onset date. (R. 152).

Another Work Activity Report (Employee) describes three other jobs that Plaintiff held since her AOD. (R. 232-35). First, in 2004, she worked for a few months as a

research assistant and was paid $15.75 an hour for 40 hours a week; she left when the grant that funded her position expired. (R. 233). In 2007, she worked as a commissions-based mortgage specialist for approximately four months until the company went bankrupt. (R. 234). In 2010, she worked another short-term temporary job as an administrative assistant. (R. 234). Of these, only the job from 2004 was determined by an SSA reviewer to have paid Plaintiff significant gainful income. (R. 242). Finally, the ALJ and the Commissioner both cite to medical records suggesting that Plaintiff also continued working at the cleaning business until as late as 2010. (Doc. 34, at 6; R. 23-24, 30, 347, 361). An April 6, 2011 treatment note, for example, states: "Since she developed back pain last year, has quit her cleaning service." (R. 361).

## B.    Medical History

### 1.    2002-2005

Plaintiff has a history of ulcerative colitis dating back to February 2002, when she presented at the University of Illinois Medical Center in Chicago ("UIC") with bloody diarrhea. (R. 612). At that time, she had an endoscopy to be evaluated for Crohn's disease, but biopsies showed "essentially normal mucosa" with no evidence of inflammation. (*Id.*). Robert Carroll, M.D., of UIC's gastroenterology ("GI") department, placed her on sulfasalazine for one month, and her symptoms resolved. He found no evidence of chronic inflammatory bowel disease and suspected "resolving bacterial colitis." (*Id.*).

Plaintiff had another episode of rectal bleeding associated with mild colitis and proctitis in June 2003, which resolved after further treatment with sulfasalazine. (R.

608).  A few months later, on November 12, 2003, Dr. Carroll opined that a reoccurrence of bleeding was associated with constipation and hemorrhoids, not colitis. (*Id*.).  The most serious colitis flare-up on record occurred November 30, 2005, when Plaintiff was hospitalized following four days of symptoms.  (R. 375, 390-94).  She improved over the course of two days and was discharged in stable condition on December 2 after a colonoscopy showed proctitis but no active bleeding through the colon.  (R. 398-99).  The doctors gave her prescriptions for sulfasalazine and lansoprazole to help control her symptoms.  (R. 398).

There are no further treatment notes in the record until 2010.  Plaintiff told a UIC doctor on September 30, 2010 that she had lost her insurance shortly after the hospitalization and continued to follow up at Cook County hospital after that time.  (R. 371).

### 2.    2010

On September 17, 2010, Plaintiff was evaluated by psychiatrist Thomas P. Benton, M.D., at the Hines, Illinois Veterans Administration Medical Center ("VAMC") in connection with her application for Veterans' benefits.  (R. 319).  This is the first of two mental health exams of record.  In his report, Dr. Benton noted that while serving in the military, Plaintiff had been hospitalized for a personality disorder and depression after experiencing harassment from her commanding officer.  (*Id*.).  He stated that "[s]ince discharge [Plaintiff] has been unable to work due to depression," and described her symptoms as including: anhedonia with loss of past interests; poor sleep; irritability; emotional lability and anxiety under stress; isolation; and passive suicidal ideation with one attempted suicide by overdose.  (*Id*.).  Dr. Benton also noted that Plaintiff had no

alcohol or substance abuse problems, was able to perform her activities of daily living "well," had no hallucinations, delusions, or homicidal ideation, and would be able to handle benefits. (R. 319-20).

On examination, Plaintiff's mental status was oriented, and she displayed good memory and speech that was both coherent and relevant. Though she was cooperative, she also presented a sad affect, psychomotor slowing, poor judgment, and "[s]ome concreteness in abstracting ability." (R. 320). Dr. Benton assigned a GAF (Global Assessment of Functioning) score of 45,[1] concluding that Plaintiff "has depression which seriously effects [sic] her ability to work." (*Id.*). In Dr. Benton's view, "it is more than likely that her depression symptoms began in military service and are related to [the] diagnosis of personality disorder she received in service." (*Id.*). Plaintiff told him that she planned to seek outpatient treatment for her depression. (*Id.*). Based on Dr. Benton's evaluation, the VA found Plaintiff to be 70% disabled due to an adjustment disorder with depressed mood, and awarded her "individual unemployability" benefits effective August 21, 2009. (R. 637-39).

As noted, Plaintiff started treating at UIC again on September 30, 2010. She reported that her GI doctor at Cook County hospital discontinued her medications for ulcerative colitis sometime in July 2010, but there is no explanation for this decision in the record. (R. 371). Plaintiff said that since going off the medication, she had

---

[1]      Although the GAF is not used in the most recent version of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V"), it was used in the previous version of that text ("DSM-IV"), and is often relied on by doctors, ALJs, and judges in social security cases. *See Steele v. Colvin*, No. 14 C 3833, 2015 WL 7180092, at *1 (N.D. Ill. Nov. 16, 2015). The lower the score, the greater the degree of impairment. *Id.* A score between 41 and 50 indicates "some serious symptoms or serious impairment in functioning," such as serious impairments in relationships with friends, in work, or in moods; or passive suicidal ideation. (http://www.dcf.state.fl.us/programs/samh/mentalhealth/mgaf.pdf, last visited January 31, 2016).

experienced two episodes of ulcerative proctitis symptoms (rectal bleeding, diarrhea, constipation, and fatigue). (R. 372). The UIC doctor instructed her to resume treatment with sulfasalazine and follow up with the GI department. (R. 374). By the time of that November 17, 2010 exam, Plaintiff had been back on sulfasalazine for three weeks and was no longer experiencing symptoms; her last reported flare-up was the prior week. (R. 387).

On October 27, 2010 Plaintiff had a Physical Therapy Lumbar Evaluation through UIC. (R. 346). Though a "significantly high amount of pain in the lumbar region" limited full evaluation, the therapist was able to assess impairments in Plaintiff's posture, muscle performance, joint mobility, motor function, and ranges of motion. (R. 349). He noted that her gait was unremarkable, but that she stood with her left knee flexed and was unable to stand on one leg for thirty seconds. (R. 348). The therapist instructed Plaintiff in basic exercise to "increase lumbar mobility and decrease irritability" of symptoms, and recommended physical therapy two times a week for four weeks. (R. 349). The record reflects two additional physical therapy sessions in November 2010. At one of these Plaintiff reported improvements in her knee pain, but said she was still experiencing significant pain in her back. (R. 352). At the other one Plaintiff again reported significant knee pain. (R. 351).

An MRI performed in November 2010 showed Baker's cysts in both of Plaintiff's knees, with the left larger than the right. There were also "mild findings that can be seen in lateral patellar tracking disorder" in her right knee. An X-ray of her spine that same month was normal. (R. 363).

### 3.    2011

On March 22, 2011, Plaintiff filed her first application for disability benefits. Shortly thereafter, on April 1, 2011, she had a sigmoidoscopy that showed localized mild inflammation in the distal sigmoid colon secondary to colitis, and biopsies were found to be "compatible with chronic inactive healed colitis."  (R. 342, 344, 361). Plaintiff was instructed to add steroidal enema treatments to her oral medications to help control flares.  (R. 604).

At a follow-up with a general practitioner at UIC on April 6, 2011, Plaintiff stated that her ulcerative proctitis was under control, causing some bleeding about once monthly with more severe episodes approximately every other month.  (R. 361).  She reported feeling stressed with all of her medical appointments, which included an appointment for psychiatric treatment at the VAMC "in a couple months." (R. 364).  Also on April 6, Plaintiff saw another doctor at UIC regarding her knee and back pain.  She reported that she had undergone a physical therapy evaluation but the therapist said her back was "too stiff" and she needed further medical evaluation before she could have more therapies.  (R. 361, 365).  The doctor noted that Plaintiff had been taking methocarbamol, a muscle relaxant that affords her some relief, exclusively at night so did not have the benefit of the medication during the physical therapy session.  (R. 365). The doctor advised Plaintiff to take the methocarbamol when in pain and to do stretching exercises daily, and also referred her to an orthopedist for the bilateral knee pain.  (*Id.*).

By April 18, 2011, Plaintiff had not yet added the recommended steroidal enemas to her colitis regimen, and Dr. Carroll (who had seen her at UIC back in 2002) judged

her disease "not completely quiescent." (R. 601). Two days later, on April 20, 2011, Plaintiff had the orthopedic exam to address her two-year history of bilateral knee pain, with the left worse than the right. (R. 377). She reported that the pain had been constant over the prior six months and worse with activity. The doctor noted point tenderness on the outside of each knee, and gave her corticosteroid injections in both knees. (R. 377-79).

Plaintiff had a lumbar spine MRI on July 8, 2011, shortly before she filed her second application for DIB on July 21, 2011. The test was "unremarkable" with no abnormalities. (R. 421-22). A few months later, on October 12, 2011, Plaintiff had her second psychological exam of record, this time in connection with her application for DIB. In his consultative report for the Bureau of Disability Determination Services ("DDS"), Glen Wurglitz, Psy.D., noted that when he asked Plaintiff to describe her current problem or condition, she stated, "ulcerative colitis." (R. 529). His report contains an extensive recitation of her physical medical history taken from her client intake form, and details her reports of knee pain. (R. 530). In a section devoted to Plaintiff's work history, Dr. Wurglitz noted that Plaintiff was a manager at a household retail service provider for seven years and had engaged in that and other professions for "more than ten years." She stated that she stopped working for her cleaning business in 2003 due to stress levels and physical limitations. She indicated that she had no plans to return to work, and that when her pain is severe and medications are not helping, she lies down. Earlier she had been applying for work but gave up trying, in part because she was experiencing pain, anxiety, stress, and bleeding. (R. 531).

Dr. Wurglitz listed Plaintiff's self-reported daily activities as: getting up at 7:00 a.m., driving her daughter to and from school, light cleaning, lying down, watching TV, taking medication, sleeping, talking to her daughter on the phone, making light meals, and helping her daughter with her homework. He noted that she talks to family nearly every day and to friends and neighbors fairly often, and attends church. He reported that Plaintiff can cook and take care of children, go shopping alone, make shopping lists, handle money and a checkbook, bathe and dress herself, and take care of her clothing. Though she cannot concentrate on a task until it is finished, she is able to understand and remember what she reads and sees on TV. (R. 532).

Plaintiff described herself as "cranky and tired," sleeping a lot, and getting aggravated easily, and admitted that "my kids say I'm always hollering." She denied any suicidal ideation or past suicide attempts. (*Id.*). Dr. Wurglitz observed that Plaintiff exhibited a "pleasant and stable" mood with appropriate affect and friendly interaction, her speech quality was "steady in rate and volume" with clear pronunciation, and she had no problem expressing herself. (*Id.*). With respect to cognitive function, Dr. Wurglitz found Plaintiff's short-term memory and delayed memory to be good and her immediate memory to be superior. Her fund of general information was fair, and awareness of current events good. She demonstrated knowledge of both simple and more complex words, her judgment was found to be good, and her abstract reasoning was very good. She was also able to complete a multi-step task involving drawing appropriate parallel lines across the page. (R. 532-33).

In the "Functional Assessment" portion of his report, Dr. Wurglitz opined that Plaintiff has an ability to understand, remember, and carry out an extensive variety of

complex and detailed instructions; and understand, remember and carry out simple one or two-step instructions. Dr. Wurglitz concluded that Plaintiff is capable of tasks at these levels "or higher," and noted that "[n]o other psychological or physical limitations were viewed as being significant" to these findings. He further saw no indication that she would have difficulty in her interactions with others, and observed "adequate concentration and attention throughout today's evaluation." (R. 533).

Based on these findings, Dr. Wurglitz did not diagnose Plaintiff with a mental disorder. He noted that, despite her report that she receives disability through the VA for PTSD, depression, and a personality disorder, there were "no supporting documents or information obtained during the interview or through the claimant's statements to indicate any of these diagnos[e]s." (*Id.*). After assigning her a GAF score of 65,[2] Dr. Wurglitz completed a Prognosis section stating that Plaintiff was "primarily reporting disability due to her physical condition," and recommending referral to the appropriate specialists to determine the degree of disability caused by her physical symptoms. (R. 534).

Eight days later, on October 20, 2011, Seth Osafo, M.D., conducted a physical examination of Plaintiff at the request of DDS. (R. 538-46). At that time, she was experiencing joint pain and stiffness in her knees and lower back, but no tingling, numbness, cramps, or swelling. (R. 539-40). She reported no constipation, diarrhea, or blood in her stool, but she did complain of: chronic back pain for twelve years, aggravated by prolonged walking, standing, and sitting; chronic knee pain for several years, aggravated by kneeling, bending, squatting, standing and walking; ulcerative

---

[2]     A GAF score above 60 generally indicates mild symptoms. *See Steele*, 2015 WL 7180092, at *1.

colitis for 21 years, resulting in frequent bowel movements with mucus and abdominal cramps; and diagnoses of depression, PTSD and personality disorder for over 21 years. (R. 538-39). Her medications included a folic acid supplement daily, a muscle relaxant and iron supplements three times daily, sulfasalazine four times daily, and steroidal enema treatments for colitis as needed. (R. 539).

Plaintiff said that she always feels down, depressed and anxious, and complained of crying, being unable to work or care for her family, and having difficulty sleeping. (R. 538). She explained that she does not see a psychiatrist because she does not have insurance and cannot afford it. (*Id.*). Physically, Plaintiff reported to the exam wearing knee braces and had mild crepitations (crackling sound) bilaterally, but she was able to walk without assistance and with a normal gait. (R. 538, 540). She also demonstrated full ranges of motion in her back, neck, and upper and lower extremities, as well as normal muscle strength in her arms and legs. (R. 540, 543-45). Plaintiff told Dr. Osafo that she can walk about two blocks before her knees and back hurt; climb stairs only with difficulty due to pain; lift a gallon of milk; and shower, dress, cook, grocery shop and drive. (R. 538). Dr. Osafo observed that Plaintiff's mood, memory, cognitive and intellectual function were appropriate during the interview, and she did not appear to be in any distress. (R. 538, 540-41). He opined that Plaintiff is able to sit, stand, walk, hear, speak, and carry and handle objects, all without limitations. (R. 541).

In a Physical RFC Assessment dated October 27, 2011, medical consultant Charles Kenney, M.D., opined that Plaintiff can lift 25 pounds frequently and 50 pounds occasionally, and can stand, walk and sit for about 6 hours in an 8-hour workday. He

also found no established postural limitations (that is, no limits in Plaintiff's ability to climb, balance, stoop, kneel, crouch, or crawl) and no manipulative limitations. (R. 548-50). Dr. Kenney opined that Plaintiff's reported activities of daily living were more limited than would be expected compared to the objective medical evidence on file, making them only "partially credible." (R. 552). In additional comments, Dr. Kenney wrote that, while Plaintiff reports chronic joint pain, there is no evidence of muscle weakness or abnormality, and she can walk without an assistive device; further, her ulcerative colitis is without evidence of complications and all other body systems are essentially normal. (R. 554).

During a consultation with the UIC neurology department on October 31, 2011, Plaintiff reported experiencing back pain for two years, sometimes radiating, which worsened with walking. (R. 578). She also reported bilateral knee pain. The doctor noted that the orthopedic department had diagnosed Plaintiff with biomechanical low back pain, coccydynia (pain in the tailbone area), pain in both knees with a high patella, and left sacroiliac joint dysfunction with no indication for surgery. Plaintiff reported that she had seen a physical therapist for four weeks but with no significant improvement. (*Id.*). She walked with limping and pain on the left leg, bearing her weigh on the right side. She was able to stand on her heels and toes, perform a half-squat, stand on her left and right foot independently, and hop on one foot maintaining balance. (R. 581). The neurologist did not assess any neurological diagnoses, noting that Plaintiff's July 8, 2011 MRI showed no nerve impingement. He recommended that Plaintiff follow up with the orthopedic department and continue in physical therapy. (R. 582).

At a November 14, 2011 follow-up with her GI doctor, Plaintiff was "doing well" and her colitis was "quiescent." (R. 600). She was following her prescribed course of treatment at that time, including steroidal enemas to control flares and ongoing oral sulfasalazine therapy. (*Id.*). A general medicine note from UIC on November 16, 2011 likewise confirmed that Plaintiff's ulcerative proctitis was "under control – improved." (R. 564).

### 4. 2012

On January 24, 2012, Calixto Aquino, M.D., affirmed Dr. Kenney's October 2011 physical RFC assessment in full. (R. 574-75). The following month, on February 22, 2012, Plaintiff went back to UIC reporting periodic blurry vision and headaches. (R. 623). The doctor advised her not to drive until the blurriness resolved, referred her for an MRI, and instructed her to get screenings for both diabetes, which can cause transient blurriness, and elevated ANA levels (consistent with some autoimmune disorders). (R. 625). At that time her proctitis was "flaring somewhat" since she "ran out of sulfasalazine briefly," and she was wearing her left knee brace and limping. (*Id.*). She reported that she had not been seeing a physical therapist but was looking for one close to her house. (R. 623).

The following month, on March 26, 2012, Dr. Carroll from UIC determined that Plaintiff's colitis was "in remission." (R. 598). A flexible sigmoidoscopy taken on May 22, 2012 confirmed that finding: "ulcerative proctitis is in excellent remission." (R. 596-97). The last available medical record is from June 20, 2012, when Plaintiff had a follow-up visit at the UIC general medicine department. She reported that she had been exercising by walking slowly on a treadmill for 30 minutes a day, and was performing

daily abdominal exercises at home.  (R. 619-20).  Her back pain, however, remained unchanged, and she continued to wear knee braces for patellar tracking disorder.  (*Id.*). Plaintiff indicated that she was still looking for a physical therapist closer to her home and was "very motivated to modify behaviors" because of possibly impaired glucose tolerance.  (R. 619, 621).

## C.    Plaintiff's Testimony

In a Function Report dated December 27, 2011, Plaintiff described limitations including "back pain, knee pain, numbness in left foot with frequent cramping of left foot causing difficulty walking and bending," and "occasional falling down."  (R. 293).  She stated that she experiences pain when bending to perform personal care like putting on shoes or applying lotion, and complained of waking up frequently at night and being "angry all the time."  (R. 293-94).  With respect to her digestive symptoms, Plaintiff said she has "frequent constipation alternating with diarrhea and rectal bleeding" causing her to stay in the bathroom for one to two hours a day.  (*Id.*).

Plaintiff indicated that she can no longer walk long distances, run, dance, or clean the house, but she does care for her 12-year-old daughter by making meals and helping with homework.  (R. 294).  She is also capable of doing chores such as making small meals, making the bed, folding clothing, dusting, and loading the dishwasher without assistance.  (R. 296).  She goes shopping for groceries, clothing, and household needs two to three times a month, and attends church at least three times a month.  (R. 296-97).  Plaintiff reported that she enjoys reading, listening to music, and doing Sudoku puzzles and can pay attention very well when not in pain, but that she finds it difficult to concentrate on anything when she is in pain or feeling sleepy from pain

medication. (R. 297-98). She described being angry, argumentative, frustrated, and upset, and indicated that she is not good at handling stress. (R. 294, 298-99).

At her hearing before the ALJ on November 14, 2012, Plaintiff testified that she was five feet nine inches tall and weighed 160 pounds, and that this represented recent weight loss that caused her doctors some concern. (R. 45-46). She testified that she has a driver's license and drives her younger daughter to school, which is "around the corner," and helps her with her homework. (R. 46). She also travels up the street to the grocery store. (R. 46-47). Plaintiff does not have trouble driving, but if her left knee locks up she has to sit in the car for a minute upon arrival at her destination before she actually gets out and walks.

As to the cleaning business, Plaintiff explained that she is bound by the franchise contract and that the paperwork and checks still come in her name, but her boyfriend does all the work. (R. 47-50). She testified that she used to do the cleaning with him until she hurt her back around the end of 2000 or the beginning of 2001, cleaning for "maybe five" hours per week, for no more than a couple of months. (R. 47, 49, 53). She stated that she has no current duties with the company and that all of the paperwork and accounting is done by the franchisor. (R. 47-48, 50). Plaintiff said that the last time she worked at any job was the temporary research position at the VA hospital in 2005 or 2006, where her job was checking patients in. She quit due to getting "stressed out and overworked." (R. 49).

Plaintiff testified that in 2000 she received an insurance payout in connection with a motor vehicle collision that resulted in a broken tailbone and nerve damage in her legs. (R. 50-51). She described her Staff Lead job at a financial institution as

supervising a phone unit, monitoring customer service calls of all of the employees in that unit. (R. 51-52). She was terminated from that job in 2000 because she was "out too much going...to the doctor with my daughter and myself." (R. 51). At that job, before her car crash, she both sat and walked but was on her feet the "majority of the time" and needed to lift boxes "between five and ten pounds." (R. 52). She did not do much lifting at the cleaning jobs but just pushed the industrial vacuum cleaner around. (R. 53).

Plaintiff stated that she does not believe she can work due to the flare-ups of her colitis, which cause constipation or diarrhea and considerable bleeding, and because of the pain in her leg. (R. 53-54). She described her flare-ups as lasting about a week, with the most recent symptoms occurring the day before the hearing. (R. 54). She described her medications as sulfasalazine, folic acid supplements, and a steroidal enema treatment to control flare-ups. (R. 54, 59-60). She said that she now takes sulfasalazine all the time, four times a day, but needs to increase her fiber intake. (R. 54-55). She testified that the condition would stop her from working because she is "in the bathroom almost 90 percent of the day," (R. 55), and her stomach pains are constant. (R. 58).

With respect to her knee impairment, Plaintiff testified that her left knee is "always hurting" and "feels like somebody has a knife in there" that they are "twisting." She explained that her knee cysts are getting bigger and that they are "like eating the muscle away." (R. 53-56, 68). She gets shooting pains down the back of her knee, and every now and then the pain will cause her leg to lock up from the knee down to the big toe. (R. 56). When that happens she is unable to move the leg, cannot walk, and will

fall down if she is not holding on to something.  (*Id.*).  She confirmed that she had received injections in her knees, but said her doctors could not put too much medication in at risk of bursting the cysts.  (R. 58).  Knee surgery is also not an option because of the Baker's cysts, and she will need to wear knee braces for the rest of her life because her kneecaps are too high.  (*Id.*).

Plaintiff stated that she was "supposed to be going to physical therapy for the knees," not to eliminate the pain but to strengthen her legs to prevent falls.  (*Id.*).  She had physical therapy for "a couple of weeks" but the location was too far from her house, she had not found anybody closer who would take Medicaid, and she had not yet signed up for VA insurance.  (R. 57).  She also noted that her doctor wanted her to use a treadmill but she had not yet done so because of pain in her knees.  (R. 65-66).  She speculated that if she did use the treadmill for 30 minutes as instructed, she probably would not be able to do anything else, like pick up her daughter from school.  (*Id.*).  She does squats but only for a short period of time, and physical therapy sessions so depleted her that she had to have someone help her to the car and drive her home.  (R. 66).

Plaintiff described her back pain as "straight across the middle" and then worse on the left side.  She testified, "the neurologist says it's two nerves that got damaged there when I was in the car accident."  She has trouble bending due to pain, and if her back gets locked up when she bends over it "feels like it's…cracking in half."  (R. 69).  In the mornings, she has to get out of bed slowly, first rolling on her side, because of her back issues.  (*Id.*).

Later in her hearing testimony, Plaintiff indicated that she can lift approximately the weight of two gallons of milk, but she cannot sit for very long because her tailbone healed crooked after it was broken in the car accident. (R. 64). She testified that she alternates between sitting and standing and can be on her feet for ten or fifteen minutes at a time. (*Id.*). Standing for a long time makes her knees hurt, sitting for a long time makes her back hurt, and she finds relief when she is sleeping. (R. 59). She testified that her daughter helps her carry things downstairs at the beginning of the day because she almost fell down the stairs when her knees gave out. (R. 64). As to household chores, she can do laundry since the laundry room is on the main floor, but her mom has to do the sweeping and mopping because it is too painful. (R. 65). Her mother and daughters care for their small dogs because Plaintiff can no longer handle walking or bathing them. (R. 67-68).

Plaintiff testified that she was psychiatrically hospitalized in 1987 and was seeing a psychiatrist after she got out of the service, but then stopped due to insurance issues. (R. 63). She indicated that now she is "depressed all of the time" from being sick and in pain and unable to do the things she used to be able to do for herself and her kids. (R. 60). As Plaintiff explained, "If I could sleep all day, I probably would." (R. 60). She reported not having much appetite anymore, (R. 64), and admitted to being frustrated with her varying medical diagnoses, including recent diagnoses of high cholesterol and possible borderline diabetes. (R. 60-61, 68). She said that her mental health issues would cause problems if she were working because she gets angry a lot, stating, "I don't think I should be around other people, period." In that regard, she sees no one but her kids and her family, but still finds herself getting angry to the point of "screaming and

hollering" even at the "little stuff" that they do.  (R. 61-62).  She quit singing in the choir and going to church because she got frustrated being around people.  (R. 67).

Plaintiff stated that she forgets things and tries to make notes to remember, and needed several reminders from various people to come to the hearing.  (R. 62).  She sometimes does Sudoku puzzles but it now takes her a few days to finish one because her mind is not focused, she does not read for pleasure, and she no longer uses her sewing machine because she lacks the energy to focus.  (R. 66-67).  Plaintiff conceded that she is receiving no ongoing mental health care, explaining that Medicaid does not cover such treatment.  At the same time, Plaintiff acknowledged that the VA had sent her a notice about signing up for an identification card so she could get treatment through the VA, but she had not yet done so.  (R. 57, 60).

**D.    Vocational Expert Testimony**

The Vocational Expert Amanda Ortman (the "VE") characterized Plaintiff's past Staff Lead job as light work with an SVP (specific vocational preparation) of five (the low end of skilled) under the Dictionary of Occupational Titles ("DOT").  (R. 77).  Plaintiff's job checking in research subjects in a receptionist position had an SVP of four (semi-skilled) and a sedentary physical demand.  As for the cleaning franchise, the VE indicated that based on Plaintiff's testimony, she had not performed the duties typical of a small business owner, which usually has an SVP of 7 (skilled) and a light physical demand.  (*Id.*).

The ALJ asked the VE to consider a hypothetical person with the same age, education, and work experience as Plaintiff and a residual functional capacity for sedentary work with the following limitations: only occasional stooping, kneeling,

crouching, crawling, and climbing of ramps and stairs; never climbing ladders, ropes, or scaffolds; the ability to perform "simple and detailed, but not complex tasks" and make "simple and detailed, but not complex" decisions; and inability to have any contact with the general public. (R. 78). The VE opined that such a person could not perform any of Plaintiff's past work, but other jobs would be available, including inspector/sorter,[3] and bench hand assembler. (*Id*.). Upon further questioning, the VE testified that if the individual had to miss work once per month for medical reasons, that would eliminate all positions, but 6 to 8 absences per year would be allowed. (R. 79, 80).

In a second hypothetical, the ALJ asked the VE to assume that a person with the same restrictions as the first individual would need to take unpredictable restroom breaks during the work day amounting to about one to two hours per day. The VE said that would eliminate all positions, even if the unpredictable restroom breaks totaled just half an hour a day, in addition to regularly scheduled breaks. (R. 78-79).

**E.     The ALJ's Decision**

The ALJ found at step one that Plaintiff has not engaged in substantial gainful activity since her alleged onset date of October 15, 2000. The ALJ made note of the fact that Plaintiff's income statements show earnings in excess of the applicable substantial gainful activity levels in 2004, 2007 and 2009. However, for the purposes of the step one finding, the ALJ elected to accept at face value Plaintiff's testimony that she earned that income as the record owner of a cleaning franchise for which she herself performed no work of any kind.

---

[3]     The DOT Code that the VE provided for this job corresponds with "SORTER (button & notion)," a job that involves inspecting buttons on a conveyor belt and discarding those with defects. (www.occupationalinfo.org/73/734687082.html, last visited February 22, 2016).

At step two, the ALJ concluded that Plaintiff has severe impairments of ulcerative colitis/proctitis; anemia; bilateral patellofemoral pain syndrome and Baker's cysts; and adjustment disorder with depression. (R. 24). The ALJ found at step three that the impairments, alone or in combination, do not meet or medically equal a Listing. (R. 24-26). As part of this analysis, the ALJ provided a detailed review of the testimony and opinion evidence relating to Plaintiff's mental health. (R. 25-26). She then determined that Plaintiff retains the RFC to perform sedentary work as defined in SSA regulations, except that she can only occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs; can never climb ladders, ropes, or scaffolds; can perform both simple and detailed, but not complex, tasks; can make simple and detailed, but not complex, decisions; and can have no contact with the general public. (R. 27-32). The ALJ concluded at step four that Plaintiff cannot perform any of her past relevant work. At step five, based upon the VE's testimony and Plaintiff's age, education, work experience, and RFC, the ALJ concluded that Plaintiff can perform occupations such as bench hand assembler, a position with 22,000 jobs in Illinois, and that she is therefore not disabled under the Social Security Act. (R. 33-34).

## DISCUSSION

**A.      Standard of Review**

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. See 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering

facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.    Five–Step Inquiry

To recover DIB under Title II of the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act. 42 U.S.C.A. § 423(a)(1)(E); *Keener v. Astrue,* No. 06–CV–0928–MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008). A person is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Crawford v. Astrue,* 633 F.Supp.2d 618, 630 (N.D. Ill. 2009). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2)

Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## C. Analysis

Plaintiff claims that the ALJ's decision must be reversed because she (1) made an inadequate credibility assessment; (2) erred in determining Plaintiff's physical and mental RFC; (3) posed incomplete hypothetical questions to the VE; and (4) did not sufficiently evaluate the finding from the Department of Veterans' Affairs that Plaintiff is unemployable.

### 1. Credibility

Plaintiff alleges multiple errors in the ALJ's assessment of her credibility. An ALJ's credibility determination is granted substantial deference by a reviewing court unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that in assessing the credibility finding, courts do not review the medical evidence *de novo* but "merely examine whether the ALJ's determination was reasoned and supported."). An ALJ must give specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Lopez ex rel. Lopez v.*

*Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (quoting *Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir. 2001)); *see also* SSR 96-7p.  However, an ALJ's credibility findings need not specify, point by point, which of the claimant's statements were not credible.  *See Shideler v. Astrue,* 688 F.3d 306, 312 (7th Cir. 2012) (citing *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003)); *McCurrie v. Astrue*, 401 Fed. Appx. 145, 149 (7th Cir. 2010).

The ALJ provided several reasons for discounting Plaintiff's credibility and supported each with evidence from the record as required.  First, the ALJ disbelieved Plaintiff's statements that she experiences frequent flare-ups of her ulcerative colitis and spends up to 90% of the day in the bathroom, citing contrasting medical records showing that her condition is well-controlled with her current medication regimen.  (R. 30).  The last time Plaintiff was hospitalized for her colitis was in 2005, during a period of time when she was not receiving any treatment.  In November 2010, the date of the next available medical record, Plaintiff was experiencing serious symptoms again but had also been taken off sulfasalazine two months earlier by her physicians at Cook County Hospital, without explanation.  (R. 30, 371-73).  Plaintiff told her doctor at UIC that prior to that time and while on sulfasalazine, she had experienced just two flare episodes per year.  (*Id.*).

Once back on medication, Plaintiff's ulcerative colitis/proctitis was "under control" by April 6, 2011, but "not completely quiescent" because she had not yet started the recommended steroidal enemas.  A biopsy report at that time confirmed findings "consistent with chronic inactive healed colitis."  (R. 30, 344, 361, 601).  In November 2011, Plaintiff's colitis and ulcerative proctitis were "quiescent" and "under control-

improved." (R. 30, 564, 600). A few months later, in March 2012, Plaintiff was fully "in remission," with a May 2012 flexible sigmoidoscopy showing the colitis to be "in excellent remission." (R. 30, 597-98). Plaintiff denies that her colitis is under control but cites only to flare-ups she had while off her medication in 2002, 2003, 2005, and 2010. (Doc. 26, at 9). On the record presented, the ALJ did not err in finding that Plaintiff exaggerated the frequency and severity of her ulcerative colitis symptoms, which are under good control with medication.

The ALJ also found Plaintiff less credible because of her inconsistent statements about work activity since her alleged onset date of October 2000. Specifically, in her hearing testimony, Plaintiff indicated that she had not performed any work for the cleaning company since a few months after she bought it in approximately 2000, yet an April 6, 2011 treatment note stated: "Since she developed back pain last year, has quit her cleaning service." (R. 30) (citing R. 361-65). The ALJ also noted that Plaintiff earned income above the substantial gainful activity level in several years following her alleged onset date, including 2004 (while working as a research assistant), 2007 (while working as a mortgage specialist), and 2009 (in connection with her cleaning company). (R. 23-24). It was not improper for the ALJ to consider this evidence as a factor in assessing Plaintiff's credibility. *See Kosiara v. Astrue*, 519 F. Supp. 2d 753, 759 (N.D. Ill. 2007) (credibility determination supported in part by inconsistencies in the plaintiff's testimony about her alleged onset date).

Additionally, the ALJ disbelieved Plaintiff's statements about the severity of her symptoms based on the minimal and conservative nature of her treatment. (R. 29). Social Security regulations permit an ALJ to find a claimant "less credible if the level or

frequency of treatment is inconsistent with the level of complaints."  SSR 96-7p.  That said, an ALJ "must not draw any inferences" about a claimant's condition from this failure without also exploring the claimant's explanations for the lack of medical care. *Id.*; *Craft*, 539 F.3d at 678-679.  "An inability to afford treatment is one reason that can 'provide insight into the individual's credibility.'"  *Craft*, 539 F.3d at 679 (quoting SSR 96-7p).

The ALJ expressly considered Plaintiff's explanation that she did not seek treatment more frequently due to "a lack of money," but also noted that she had not pursued any "low-income health care options."  (R. 29).  Plaintiff faults the ALJ for not specifying what such options might be, arguing that claimants cannot be expected to go to hospital emergency rooms for routine care.  (Doc. 26, at 10-11) (citing *Goins v. Colvin*, 764 F.3d 677, 679-80 (7th Cir. 2014)) ("Hospitals charge very high prices for emergency room services for non-emergency conditions, are assiduous in trying to collect those charges, and are required to treat an indigent only if the indigent is experiencing a medical emergency.") (internal quotations omitted).  This argument ignores the ALJ's repeated references to Plaintiff's veteran status, which gives her access to health care services through the VMAC.  (R. 26-27, 29-30, 32).

In hearing testimony on November 16, 2012, Plaintiff acknowledged that she could "sign up for VA, my VA insurance" but had not done so.  (R. 57).  As a result, she had not been able to pursue physical therapy for her back and knee pain since November 2010.  (*Id.*).  Nor had she received any mental health treatment even though she had talked about doing so through the VA as far back as September 2010.  (R. 60, 320, 377).  This is not a case where Plaintiff attempted to seek treatment and failed

because of bureaucratic delays. Rather, she did not even take the first steps necessary to sign up for services in more than two years. *Compare Hall v. Colvin,* 778 F.3d 688, 690 (7th Cir. 2015) (plaintiff provided a good reason for not seeing doctors more frequently when he explained that he had found it "very difficult to get an appointment with a Veterans Administration doctor.").

The ALJ reasonably concluded that Plaintiff's failure to pursue any mental health services in more than two years, or even get the ball rolling on her VA insurance, cast doubt on her claim of disabling depression. (R. 26-27). As discussed below, moreover, the ALJ gave Plaintiff the benefit of the doubt as to at least some of her stated symptoms in formulating a mental RFC. With respect to Plaintiff's back and knee pain, the ALJ fairly observed that despite receiving minimal treatment, medical exams from October 2011 showed that she was able to stand on her heels and toes, perform a half-squat, stand on her left and right foot independently, hop on one foot maintaining balance, and walk unassisted for 50 feet with a normal gait. She also exhibited full range of motion in her back, neck, arms and legs, and normal muscle strength in her arms and legs. (R. 29, 31, 538, 540, 581). The ALJ did not err in finding that this evidence undermined Plaintiff's allegations of disabling back and knee pain that would prevent her from performing any work.

Plaintiff finally objects that the ALJ improperly equated her ability to perform activities of daily living with an ability to engage in full-time work. (Doc. 26, at 12). The Court disagrees. It is appropriate for an ALJ to consider a claimant's daily activities when evaluating credibility as long as this is done "with care." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). The ALJ found that Plaintiff's daily activities are not as

limited as would be expected given her complaints of disabling symptoms and limitations, but did not afford that evidence exclusive or even heavy weight. (R. 29). *Compare Allen v. Colvin*, No. 2:13-CV-00358-JMS, 2014 WL 2930341, at *7 (N.D. Ind. June 26, 2014) (ALJ erred where opinion "suggests that he heavily (perhaps exclusively) relied on [daily] activities to make the credibility determination."). Since the ALJ provided several reasonable bases for discounting Plaintiff's testimony, she did not err in also considering Plaintiff's daily activities as one additional factor.

Viewing the record as a whole, the ALJ's credibility finding is not patently wrong and does not justify remanding the case. *See Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) ("[T]he standard of review employed for credibility determinations is extremely deferential," and an ALJ need only "provide some evidence supporting her determination.").

## 2. RFC Assessment

Plaintiff next challenges the ALJ's assessment of both her mental and physical residual functional capacities. The RFC is "the most that the claimant can still do despite her limitations." *Dzurko v. Colvin*, No. 12 C 3235, 2013 WL 6822659, at *5 (N.D. Ill. Dec. 26, 2013) (citing 20 C.F.R. § 404.1545(a)).

### a. Mental RFC

Looking first to the mental RFC, Plaintiff argues that the ALJ failed to properly weigh the opinions from Dr. Benton and Dr. Wurglitz. (Doc. 26, at 3; Doc. 36, at 2-3). Dr. Benton found in September 2010 that Plaintiff's adjustment disorder with depressed mood "seriously [a]ffects her ability to work." (R. 320). He noted that though she was cooperative, she exhibited a sad affect, psychomotor slowing, poor judgment, and some

concreteness in abstract thinking. She also reported anxiety, anhedonia, and passive suicidal ideation, and Dr. Benton assigned her a very low GAF score of 45. (R. 319-20). A year later, in October 2011, Dr. Wurglitz opined that Plaintiff has no diagnosable mental impairment at all. Her memory was good to superior, she exhibited good judgment and abstract reasoning, her concentration was adequate, she had no problem expressing herself, and she was able to complete a multi-step task involving drawing appropriate parallel lines across the page. Dr. Benton concluded that Plaintiff can at a minimum understand, remember and carry out simple but detailed instructions, and would have no difficulty interacting with others. He assigned her a much higher GAF score of 65. (R. 532-34).

The ALJ accepted Dr. Benton's conclusion that Plaintiff suffers from the severe impairment of adjustment disorder with depression, but assigned little weight to his opinion that this condition seriously impacts Plaintiff's ability to work. (R. 24, 27). The ALJ first explained that Dr. Benton "had only seen [Plaintiff] once for purposes of VA compensation and pension," and her performance and appearance at the evaluation was "in contrast" with Dr. Wurglitz's opinion, which she assigned great weight. (R. 27). Since Dr. Wurglitz also saw Plaintiff only one time and solely for purposes of a benefits determination, however, this is not a proper basis for crediting his opinion over that of Dr. Benton.

Regardless, the ALJ also referenced the fact that Plaintiff has not received any mental health treatment since Dr. Benton diagnosed her with depression in September 2010.[4] (R. 27, 30, 320). Despite going for more than a year without such care, Dr.

---

[4] In fact, Plaintiff testified at the hearing that she has not had any mental health treatment since she was discharged from the Navy in 1987. (R. 63).

Wurglitz found no evidence of any mental impairment in October 2011. (R. 27, 533). Indeed, Plaintiff told Dr. Wurglitz that her primary concern at that time was her ulcerative colitis, and though she described a host of other physical problems, she said virtually nothing about her mental health. (R. 27, 529, 534). In light of this evidence, the ALJ did not err in giving greater weight to Dr. Wurglitz's opinion than to Dr. Benton's. *See Barnes v. Astrue*, No. 08-2294, 2010 WL 1416884, at *4 (C.D. Ill. Apr. 1, 2010) (quoting 20 C.F.R. § 404.1527(f)(2)(i)) ("The regulations provide that state agency consultants are 'highly qualified physicians . . . who are also experts in Social Security disability evaluation."); *Oviedo v. Astrue*, No. 11 C 50262, 2013 WL 5312352, at *8 (N.D. Ill. Sept. 18, 2013) (the ALJ "must resolve any discrepancies in the [medical opinion] evidence and base a decision upon the record as a whole.").

Plaintiff contends that the ALJ still erred by failing to adopt either of the two psychological opinions in full, which Plaintiff says "created an evidentiary deficit" that she filled in "with her own opinions." (Doc. 26, at 6; Doc. 36, at 4). In Plaintiff's view, though the ALJ said she was affording great weight to Dr. Wurglitz's opinion, she essentially rejected it by finding Plaintiff more limited than he suggested. (Doc. 36, at 4) (arguing that the ALJ "did not adopt [Dr. Wurglitz's] assessments, instead offering differing limitations."). The Court disagrees and finds nothing improper about this aspect of the ALJ's analysis.

An ALJ "is not required to rely entirely on a particular physician's opinion or choose between the opinions of . . . the claimant's physicians." *Schmidt*, 496 F.3d at 845. The ALJ made it clear that she accepted Dr. Wurglitz's opinion that Plaintiff has the functional ability to understand, remember, and carry out "simple one or two step

instructions," and to perform "detailed tasks."  (R. 27).  But she also gave Plaintiff "the benefit of doubt" and "further restricted her to performing no complex tasks and making no complex decisions based on complaints of pain and lack of focus," and limited her to having "no contact with the general public due to being easily irritated with others." (*Id.*). This conclusion is supported by medical records referencing Plaintiff's complaints of pain, and reports of anger issues she made to both Dr. Wurglitz and Dr. Benton.  (*See, e.g.*, R. 61-62, 66-67, 319, 348, 377-79, 532).  *See also Dampeer v. Astrue*, 826 F. Supp. 2d 1073, 1085 (N.D. Ill. 2011) (RFC was supported by substantial evidence where the ALJ "accepted alternate medical evidence and incorporated several additional limitations to give Claimant's subjective assessments the benefit of the doubt.").  Plaintiff's request for remand based on the mental RFC is denied.

### b.  Physical RFC

For similar reasons, the Court finds no error in the ALJ's physical RFC assessment.  Plaintiff again contends that the ALJ left an evidentiary deficit by rejecting all of the opinions of record.  (Doc. 26, at 7; Doc. 36, at 5).  This is not accurate.  The ALJ assigned great weight to the October 20, 2011 opinion from Dr. Osafo that Plaintiff is able to sit, stand, walk, hear, speak, and carry and handle objects without limitation, but also found that "some additional limitations are warranted . . . giving the greatest weight to subjective complaints possible."  (R. 31, 541).  Specifically, the ALJ restricted Plaintiff to sedentary work involving only occasional stooping, kneeling, crouching, crawling, and climbing ramps or stairs, and no climbing of ladders, ropes or scaffolds.  (R. 27).  The ALJ also decided to give only some weight to the opinions from Dr. Kenney and Dr. Aquino that Plaintiff is capable of a full range of medium work because

they "did not have an opportunity to consider subsequent documentation and testimony in making their conclusions about [Plaintiff's] limitations." (R. 31-32).

The Court finds nothing improper about this analysis. Once again, the ALJ has reasonably accepted portions of the opinion evidence of record but also incorporated additional restrictions to account for some of Plaintiff's credible subjective complaints. *Schmidt*, 496 F.3d at 845; *Dampeer*, 826 F. Supp. 2d at 1085. For example, the ALJ acknowledged medical records documenting Plaintiff's visits to her doctors and physical therapist for knee and back pain, and a November 2010 MRI showing Baker's cysts in both knees. (R. 30-31). Yet she also noted that a July 2011 MRI of the lumbar spine revealed no nerve impingement, and a neurologist from UIC observed in October 2011 that Plaintiff could stand on her heels and toes, perform a half-squat, stand on her left and right foot independently, and hop on one foot maintaining balance. (R. 29, 581). That same month, Dr. Osafo found that Plaintiff could walk unassisted for 50 feet with a normal gait; had full range of motion in her back, neck, arms and legs; and had normal muscle strength in her arms and legs. (R. 31, 538, 540).

Plaintiff argues that the RFC is still fatally flawed because it fails to account for her ulcerative colitis, which she again insists was not under control. (Doc. 36, at 7). As explained earlier, the medical evidence belies this assertion. Plaintiff experienced some flares of her symptoms in 2002, 2003, 2005, and 2010, but those all occurred while she was off sulfasalazine. When properly medicated with both sulfasalazine and steroidal enema treatments, the colitis/proctitis is well controlled, as reflected in medical reports from April 2011 (colitis was "under control"), November 2011 (colitis/proctitis "quiescent"

and "under control-improved"), and March and May 2012 (condition is "in remission" or "in excellent remission."). (R. 30, 344, 361, 564, 597-98, 600).

In sum, the stated physical RFC is more restrictive than any medical opinion of record, and it affords Plaintiff the greatest possible benefit consistent with the ALJ's credibility findings. The RFC determination is supported by substantial evidence and does not require remand.

### 3. Hypothetical to the Vocational Expert

Plaintiff next argues that the ALJ erred by failing to incorporate two of her limitations into the hypothetical questions posed to the VE at step five of the analysis. First, Plaintiff says the ALJ ignored her step-three finding of "mild to moderate difficulties" in maintaining concentration, persistence or pace. When relying on the testimony of a VE to determine what work a claimant can do, an ALJ must bring to the VE's attention all of a claimant's limitations supported by the medical record. *Varga v. Colvin,* 794 F.3d 809, 813, 813 (7th Cir. 2015); *Yurt v. Colvin,* 758 F.3d 850, 857 (7th Cir. 2014); *Simila,* 573 F.3d at 520. The Seventh Circuit has repeatedly held this to include limitations in concentration, persistence, or pace. *Varga,* 794 F.3d at 813; *O'Connor-Spinner v. Astrue,* 627 F.3d 614, 619 (7th Cir. 2010); *Stewart v. Astrue,* 561 F.3d 679, 684 (7th Cir. 2009); *Kasarsky v. Barnhart,* 335 F.3d 539, 544 (7th Cir. 2003). It is not always necessary that the specific terminology, "concentration, persistence, or pace" be used in the resulting RFC and VE hypothetical, provided that the claimant's specific limitations in those areas are addressed in the ALJ's alternative phrasing. *O'Connor-Spinner*, 627 F.3d at 619.

There is no medical report in the record stating that Plaintiff is limited in concentration, persistence or pace as contemplated by the Social Security regulations. Dr. Benton said Plaintiff's concentration was "poor" with psychomotor slowing in September 2010, but Dr. Wurglitz found her to have "adequate concentration and attention" in October 2011. (R. 533). Dr. Wurglitz further opined that Plaintiff has the ability to understand, remember, and carry out an extensive variety of complex and detailed instructions; understand, remember and carry out simple one or two-step instructions; maintain concentration, persistence, and pace to carry out specified tasks and tolerate work setting stressors; and interact appropriately with supervisors, co-workers and the general public. (*Id.*). As explained earlier, the ALJ reasonably afforded Dr. Wurglitz's assessment great weight.

In finding that Plaintiff nonetheless has mild to moderate difficulties with concentration, persistence or pace for purposes of a step three analysis, the ALJ credited Plaintiff's statements that she has trouble focusing when she is in pain, does not handle stress well, and gets frustrated with changes in routine. (R. 25). At steps four and five, the ALJ adopted Dr. Wurglitz's opinion that Plaintiff can perform simple and detailed tasks, and make simple and detailed decisions, but found her incapable of complex tasks and decisions specifically to account for the effects of "complaints of pain and lack of focus." (R. 27). The ALJ also limited Plaintiff to no contact with the general public "due to being easily irritated with others." (*Id.*). The ALJ expressly incorporated all of these limitations into the hypothetical questions posed to the VE. (R. 78). Viewing the record as a whole, the ALJ adequately accounted for Plaintiff's impairment in concentration, persistence or pace. *See Parrott v. Astrue,* 493 Fed. Appx. 801, 805 (7th

Cir. 2012) ("The ALJ did include [the plaintiff's] concentration and pace limitation in the hypothetical when she asked the vocational expert to assume that [the plaintiff] could not do complex tasks.").

Plaintiff also finds error in the ALJ's omission of the effects of her ulcerative colitis from the hypothetical questions posed to the VE. In support of this argument, Plaintiff stresses the VE's testimony that even two daily unpredictable bathroom breaks totaling 30 minutes, on top of regularly scheduled breaks, would preclude competitive employment for a person of Plaintiff's background and RFC. The trouble for Plaintiff is that the ALJ reasonably discounted her testimony about the frequency, duration, and intensity of her ulcerative colitis flare-ups. As detailed above, the ALJ found that this testimony ran contrary to medical evidence, which overwhelmingly indicates that Plaintiff's symptoms are well-controlled with medication. The ALJ therefore was not required to incorporate into the hypothetical questions any additional limitations from Plaintiff's claimed proctitis symptoms. *Simila*, 573 F.3d at 521 ("[T]he ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible.").

### 4. Analysis of the Veterans Administration's Findings

Finally, Plaintiff argues that the ALJ did not give sufficient weight to the VA's finding that she is 70% disabled due to an adjustment disorder with depressed mood and, thus, "individually unemployable." The Social Security Administration is not directly bound by the disability findings of another agency, and the Department of Veterans Affairs requires less proof of disability than the SSA does. *Allord v. Barnhart,* 455 F.3d 818, 820 (7th Cir. 2006) (citing *Davel v. Sullivan,* 902 F.2d 559, 560–61 n.1 (7th Cir.

1990)).   That said, the Seventh Circuit has long instructed that VA disability determinations should be given at least "some weight."  *Allord,* 455 F.3d at 820.  In a recent decision, the court held that an ALJ cannot reject an unemployability finding merely because "the two agencies use different criteria for determining disability," explaining that "the differences are small."  *Hall,* 778 F.3d at 691.  *Compare* 38 C.F.R. § 4.16 (The Veterans Administration's "total disability ratings for compensation may be assigned…when the disabled person is, in the judgment of the rating agency, unable *to secure or follow a substantially gainful occupation* as a result of service-connected disabilities….") *with* 20 C.F.R. § 423 ("The term "disability" means… inability to engage in any *substantial gainful activity*….") (emphasis added).

The ALJ in this case acknowledged the VA's finding that Plaintiff is "unemployable" effective August 21, 2009.  Plaintiff concedes that determination was based on Dr. Benton's September 2010 evaluation: "The VA examin[er] opined . . . that you have been unable to work due to your adjustment disorder with depressed mood." (R. 639; Doc. 26, at 3).  As explained earlier, the ALJ reasonably afforded little weight to Dr. Benton's opinion given that Dr. Wurglitz reported significantly contrary findings a year later even though Plaintiff had not received any treatment for her mental condition during that period.  (R. 27, 638).  Without Dr. Benton's assessment, there is no other support for the VA's pronouncement that Plaintiff is totally unemployable due to a mental impairment, and the ALJ did not err in declining to give that decision more weight.  *See Gleason v. Colvin*, No. 13-C-1378, 2015 WL 3454126, at *24 (E.D. Wis. May 29, 2015) (no remand necessary where ALJ failed to discuss the VA disability

rating decision but did consider the opinions from the VA doctors on which it was based).

It is worth noting that Dr. Benton's opinion was also based in part on Plaintiff's report that she had not worked at all since she was honorably discharged from the Navy in 1987. (R. 319) ("Since discharge pt has been unable to work due to depression with anhedonia, isolation, passive suicidal ideation & irritability."). In fact, as outlined above, Plaintiff had a fairly extensive work history over the course of several years between the time of her discharge and her alleged onset date of October 2000. These include hospital billing clerk from 1989-1990; clinic clerk at the University of Illinois Hospital from 1990-1992; interviewer for a data entry company from 1996-1997; and Staff Lead at Household Finance from 1997-2000. (R. 276-84). Indeed, Plaintiff applied for DIB (as opposed to Supplemental Security Income) precisely because she paid Social Security taxes as a worker for significant portions of her adult life. This evidence, too, fairly undermines Dr. Benton's opinion.

## CONCLUSION

For the reasons stated above, the decision of the ALJ is affirmed. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: February 23, 2016

SHEILA FINNEGAN
United States Magistrate Judge